E-FILED
Tuesday, 13 December, 2022  02:56:24 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| GARY HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-3099 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Before the Court is a Motion for Partial Summary Judgment submitted by Plaintiff Gary Hicks (d/e 33) and a Motion for Summary Judgment in full submitted by Defendants John Eilers, Rob Jeffreys, Michelle Neese, Josh Yargus.  (d/e 35).  Plaintiff Hicks has also filed a Motion to Strike Exhibit 20 to Defendants' Motion. (d/e 37).  Defendants did not violate the First Amendment when they suspended Plaintiff after finding he violated the Illinois Department of Corrections' ("the Department") Code of Conduct because Plaintiff did not speak on matters of public concern, because Plaintiff identified himself as an employee of the

Department when speaking, and because Plaintiff's interest in speaking did not outweigh the Department's interest in performing its functions. Defendant's actions also did not violate the Fourteenth Amendment because the Code of Conduct was not impermissibly vague. Further, Defendants are entitled to the affirmative defense of qualified immunity as to the damages requested in both of Plaintiff's Counts because Defendants' actions did not violate clearly established law. Therefore, Plaintiff's Motion for Partial Summary Judgment (d/e 33) is denied, and Defendants' Motion for Summary Judgment (d/e 35) is granted. Plaintiff's Motion to Strike (d/e 37) is denied as moot because the Court does not consider the material in Exhibit 20 in reaching this decision.

## I.   FACTS

The Court draws the following facts from the parties' statements of material facts, taking into account each party's objections thereto. Any fact unobjected to is deemed admitted. The Court discusses material factual disputes, if any, in its analysis.

Plaintiff Gary Hicks was an employee of the Illinois Department of Corrections at the Robinson Correctional Center beginning in 2001 as a Correctional Officer Trainee until his

retirement as a Correctional Sergeant in 2021.  Pl.'s Mem. (d/e 34)
pp. 1, 6; Defs.' Mot. (d/e 35) pp. 1, 3, 9.  Defendant Rob Jeffreys
has been the Director of the Department since June 1, 2021;
Defendant John Eilers has been the Chief of Operations for the
Department since March 30, 2019; Defendant Michelle Neese was
Acting Warden at the Robinson Correctional Center, a Department
facility, during the events in this case; and Defendant Josh Yargus
has been a Correctional Lieutenant at the Robinson Correctional
Center since July 2018, and was assigned to internal affairs there
from then until January 2020.  Pl.'s Mem. pp. 6–8.  Named
Defendant Nikki Robinson was Deputy Director of the Department,
but she has since retired and has not been served with the
Amended Complaint.  <u>See</u> Pl.'s Mem. p. 5, n. 1.

 As an employee of the Department, Plaintiff was subject to
various employment and employee behavior policies.  One such
policy was Administrative Directive 03.02.108 ("AD 03.02.108"),
effective October 1, 2013, which stated that Department employees
were required "to conduct themselves in a professional manner and,
whether on duty or off duty, not engage in conduct that is
unbecoming of a State employee or that may reflect unfavorably on

or impair operations of the Department."  Defs.' Ex. 7 p. 1.
Robinson Correctional Center had a corresponding Institutional
Directive 03.02.108 ("ID 03.02.108") which included identical
language to AD 03.02.108 as well as a nondiscrimination
subsection.  Defs.' Ex. 8 pp. 1, 15.  That subsection prohibited
Robinson Correctional Center employees from discriminating
against other employees or offenders housed at Robinson on the
basis of "race, color, sex, religion, age, arrest record, national
ancestry, or origin, physical or mental disability, marital status,
sexual orientation, citizenship status, or unfavorable discharge
from the military services."  Id. p. 15.  Employees who violated
either AD 03.02.108 or ID 03.02.108 were subject to discipline.
Defs.' Ex. 7 p. 1; Ex. 8 p. 1.  Lastly, Departmental Rule 120 stated
that all Department employees "shall conduct themselves in a
manner that will not reflect unfavorably on the Department and
shall not engage in conduct that is unbecoming of an employee or
that may reflect unfavorably on or impair the operations of the
Department."[1]  Defs.' Ex. 9.  The Department did not have a social

---

[1] Administrative Directive 03.02.108, Institutional Directive 03.02.108, and Departmental Rule
120 are collectively referred to as the Department's "Code of Conduct" throughout.

media policy during the events that gave rise to this suit.  Defs.'
Mot. p. 6.

Plaintiff, like many people, also maintained a personal online
social media presence via a Facebook profile.  Pl.'s Mem. p. 8; Defs.'
Mot. p. 4.  Plaintiff's profile was publicly accessible and
unrestricted, that is, anyone could view Plaintiff's profile and see all
content he either posted or shared.  Defs.' Mot. p. 4.  Plaintiff listed
as his occupation "Corrections Sergeant at Illinois Department of
Corrections" on his profile and his profile included a photo of him in
Department uniform.  Defs.' Ex. 1 pp. 4 & 5.

In the spring and summer of 2019, Plaintiff either shared
posts authored or created by others or authored posts himself
which he then published to his Facebook page.  Two shared posts
included images of U.S. Congresswomen: one with an image of U.S.
Representative Ilhan Omar with superimposed text reading,

> Musslamic [sic] Democrat, Ilhan Omar, has
> threatened Members of Congress. She's told
> several Republicans that she'll send them
> 'shawarma,' to give them a taste of her culture.
> Share to say arrest her now!

Pl.'s ex. 1 p. 3.  Another displayed an image of U.S. Representative
Rashida Tlaib edited to depict her wearing a sombrero with the

word "Mexico" on the brim and text superimposed across the image

reading,

> Mexican word of the day: Tlaib. If you don't
> like the USA you are welcome Tlaib.

Id. p. 2.

Two other shared posts included only text.  One read,

> The devil is a liar. Abortion is murder
> homosexuality is sin and Allah is not God!

Id. p. 7.  The other read,

> Things We Don't See Jews Doing. 1. Flying
> Planes Into Buildings. 2. Supporting
> Terrorism. 3. Forcing Young Girls To Marry
> Old Men. 4. Mutilating Females [sic] Genitalia.
> 5. Beheading People. 6. Trying To Dominate
> The World. 7. Stonings. 8. Canings. 9.
> Lashings. 10. Trying To Destroy America.

Id. p. 6.  Plaintiff also authored one post in which he stated,

> Dear Lord, if there must be a civil war or a
> government overthrow, please let it happen
> before I am dead or too old to fight in it.
> Amen.

Id. p. 1.  Plaintiff asserts, and Defendants do not dispute, that the

posts were not made while Plaintiff was at work and that none of

them mentioned the Department or his employment.  Pl.'s Mem. p.

10; Defs.' Resp. (d/e 41) p. 4.[2]

At some point in early September 2019, a reporter contacted

Lindsey Hess, the Department's public information officer, to

discuss several Facebook posts made by various Department

employees, including Plaintiff's.  Defs.' Ex. 11, 11:11–14; Pl.'s Ex. 2,

p. 3.  That prompted Josh Creek, an investigator with the

Department, to interview Plaintiff about his Facebook posts on

September 3, 2019.  Defs.' Ex. 12, p. 3.  Plaintiff admitted the posts

were his own and that, in his view, the posts only reflected his own

beliefs.  Pl.'s Mem. p. 12.  Plaintiff also stated that his views never

impacted his work with the Department.  Id.

The next day, an article about Facebook posts of various

Department employees was published in the Chicago Sun Times.

Defs.' Ex. 3.  The article included Plaintiff's post about participating

in any future civil war or government overthrow and called his other

posts "homophobic" and "Islamophobic."  Id.   The article also noted

---

[2] While Defendants repeatedly state in the Undisputed Immaterial Facts section of their Response (d/e 41) that the Facebook posts "were made during the course of [Plaintiff's] employment," pages 9–14, Defendants neither offer clarity on what they mean by "course of employment" nor offer citation to evidence to support that statement.

that all the individuals referenced, including Plaintiff, identified

themselves as Department employees in their Facebook profiles.

Id.; Defs.' Mot. p. 4.

Investigator Creek included references to the article in his final

Investigation Report.  Defs.' Ex. 12.  He then concluded that the

Facebook posts, while reflecting Plaintiff's personal views, violated

the Department's Code of Conduct as reflected in AD 03.02.108, ID

03.02.108, and Departmental Rule 120 because Plaintiff's posts

"reflect[ed] negatively on the [D]epartment as well as the

[D]epartment's overall mission."  Id.  Mark Delia, the Department's

Chief of Investigation and Intelligence, then sent Michelle Neese,

Acting Warden of Robinson Correctional Center, a Memorandum on

September 11, 2019 restating Creek's conclusion.  Id. pp. 1–2.  On

October 2, 2019, Neese sent Plaintiff a Memorandum notifying him

of the completion of the investigation and stating that there would

be further disposition of the investigation.  Defs.' Ex. 13.  On

October 3, Josh Yargus, Correctional Lieutenant in Internal Affairs,

sent Neese a Memorandum requesting Plaintiff's matter be referred

to the Employee Review Board.  Defs.' Ex. 14.  Neese concurred

with that request and Plaintiff was notified that an Employee

Review Hearing was scheduled for October 15, 2019.  Defs.' Exs.
14–16.

At the October 15 hearing, the charges of violating Code of
Conduct were read again, and the hearing officer heard statements
from Plaintiff, his Union Representative, and the Management
Representative.  Defs.' Ex. 16.  The hearing officer then concluded
that Plaintiff violated the Code of Conduct and recommended
Plaintiff be suspended for ten days.  Id.  Director Jeffreys eventually
approved the ten-day suspension, effective November 4, 2019
through November 14, 2019, a decision also approved by Chief of
Operations Eilers.  Defs.' Ex. 19; Defs.' Mot. p. 7.  This was
Plaintiff's first and only discipline in his 18 years of employment
with the Department.  Pl.'s Mem. p. 16.  Since then, Plaintiff retired
from the Department and does not intend to return to employment.
Pl.'s Mem. p. 6; Defs.' Mot. p. 9.

Plaintiff filed suit against Defendants on April 7, 2020.  See
Compl. (d/e 1).  He filed an Amended Complaint on October 25,
2021, in which he alleged that Defendants' actions in suspending
his employment and the subsequent records of such suspension
amount to violations of his First and Fourteenth Amendment rights

to free speech and due process.  Id.  Plaintiff now moves for partial summary judgment while Defendants move for summary judgment in full.

## II.    LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).

On that evidence, the Court must determine whether a genuine dispute of material facts exists.  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).  When ruling on a motion for summary judgment, the Court

must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  <u>Woodruff v. Mason</u>, 542 F.3d 545, 550 (7th Cir. 2008).

The above-stated standards for summary judgment remain unchanged when considering cross-motions for summary judgment: the Court must "construe all inferences in favor of the party against whom the motion under consideration is made."  <u>Oneida Nation v. Vill. of Hobart, Wis.</u>, 371 F. Supp. 3d 500, 508 (E.D. Wis. 2019) (quoting <u>Metro. Life Ins. Co. v. Johnson</u>, 297 F.3d 558, 561–62 (7th Cir. 2002)).

### III.   ANALYSIS

Plaintiff alleges that the Defendants' actions suspending Plaintiff for ten days amount to a violation of his rights under the First Amendment in that Defendants retaliated against Plaintiff because of his personal, political, and religious beliefs.  Plaintiff also argues that the Code of Conduct is unconstitutionally vague as applied to his Facebook posts in violation of the Fourteenth Amendment.

a.  **Defendants did not violate the First Amendment because Plaintiff's speech was not protected speech under the First Amendment and because Plaintiff's interest in speaking was outweighed by Defendants' interest in maintaining effective public service.**

"To make out a prima facie claim for a violation of First Amendment rights, public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." Bless v. Cook Cty. Sheriff's Office, 9 F.4th 565, 571 (7th Cir. 2021) (quoting Yahnke v. Kane Cty., 823 F.3d 1066, 1070 (7th Cir. 2016)); Harnishfeger v. United States, 943 F.3d 1105, 1112–13 (7th Cir. 2019).  The parties do not dispute that Plaintiff can satisfy the second and third elements—he was indisputably suspended because of the Facebook posts.  Instead, the parties focus only on whether Plaintiff's speech as portrayed in the Facebook posts was constitutionally protected.

"Whether a public employee's speech is constitutionally protected is a question of law." Harnishfeger, 943 F.3d at 1113. The answer to this question is controlled by a number of steps culminating in the balancing test set out in Pickering v. Board of

Education, 391 U.S. 563 (1968).  The first step, though, requires the plaintiff to satisfy one or both of two threshold inquiries. Harnishfeger, 943 F.3d at 1113.  Plaintiff asserts his case passes both threshold inquiries.

The first inquiry requires a plaintiff to show that he spoke as a citizen rather than an employee, Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), and that he spoke on a matter of public concern and not a matter of personal interest, Connick v. Myers, 461 U.S. 138, 147 (1983).  The second inquiry requires a plaintiff to show that his speech was neither at work nor about work and that the employee did not take deliberate steps linking himself and his speech to his employer.  United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995) ("NTEU"); City of San Diego v. Roe, 543 U.S. 77, 81 (2004).

As to the first inquiry, the parties' dispute centers on whether Plaintiff's speech in the Facebook posts was about matters of public concern.  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of

value and concern to the public." <u>Snyder v. Phelps</u>, 562 U.S. 443,

453 (2011) (citations and internal quotation marks omitted).  In

deciding whether speech is of public concern, courts look to the

"content, form, and context of that speech as revealed by the whole

record." <u>Id.</u> (citations and internal quotation marks omitted).  No

one factor is dispositive, and all circumstances of the speech must

be considered, "including what was said, where it was said, and

how it was said." <u>Id.</u>  The content of the speech, however, "remains

the most important factor in determining whether speech addresses

a matter of public concern." <u>Kristofek v. Vill. of Orland Hills</u>, 712

F.3d 979, 984 (7th Cir. 2013).  "[S]peech that addresses 'a private

or personal interest'" is not speech of public concern.  <u>Valetino v.</u>

<u>Vill. of S. Chicago Heights</u>, 575 F.3d 664, 671 (7th Cir. 2009)

(quoting <u>Spiegla v. Hull</u>, 371 F.3d 928, 935 (7th Cir. 2004)).

Plaintiff's speech here was not on matters of public concern.

None of the Facebooks posts shared by Plaintiff addressed "a

subject of general interest and value and concern to the public."

<u>Snyder</u>, 562 U.S. at 453.  The posts about the Congresswomen were

not directed towards any stance, initiative, or policy position held,

nor were they directed toward their respective campaigns.  Instead,

the post about Congresswoman Omar falsely accused her of
threatening other members of congress and encouraged her arrest.
Pl.'s Mem. p. 30.  The post about Congresswoman Tlaib altered her
image and incorrectly branded her name as a "Mexican word of the
day" and suggested anyone who did not "like the USA" to "Tlaib,"
evidently rhyming the Congresswoman's last name with "to leave."
Id. at 34.  This post, Plaintiff admits, related to former President
Trump's 2019 suggestion that Congresswoman Tlaib and others "go
back and help fix the totally broke and crime infested places from
which they came."  Id.[3]  Such speech does nothing to advance the
debate of any serious issue among the public and only reflects
Plaintiff's "private or personal interest" in the Congresswomen.
Spiegla, 371 F.3d at 935.  The content, form, and context of the two
Facebook posts about Representatives Omar and Tlaib, when
viewed in light of the whole record, clearly show that the posts were
not designed to advance any kind of public discussion but only to
express Plaintiff's personal views.

---

[3] Plaintiff's Memorandum quotes the article by Bianca Quilantan and David Cohen titled *Trump tells Dem congresswomen: Go back where you came from* as published in Politico on July 14, 2019, at 9:15 AM and available at https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692.

Plaintiff also wrote "if there must be a civil war or government overthrow," he wished it would "happen before [he was] dead or too old to fight in it."  Pl.'s Ex. 1, p. 1.  Like the posts expressing personal interest in Representatives Omar and Tlaib, that is not a statement advancing a subject of legitimate news interest.  Rather, it is an incendiary remark expressing a personal wish to participate in a war against other Americans or against the government.  The post does nothing to raise awareness of any general societal concern in Plaintiff's community, nor is it a discussion of the merits of any an issue.  Indeed, as Plaintiff admits, both his shared and authored posts were about "his personal political and religious views."  Pl.'s Mem. (d/e 34) p. 12; see also id. pp. 25, 28, 34.  Such speech is outside the definition of speech involving a matter of public concern.  As such, Plaintiff's claim does not pass the first threshold inquiry under Connick and Garcetti.

Plaintiff's claim also does not pass the second, alternative inquiry under United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995) ("NTEU").  Under the NTEU inquiry, a plaintiff must show that the speech was (1) made outside the workplace, (2) involved content largely unrelated to his government

employment, and (3) is addressed to a public audience or involves

any matter for which there is a potential public audience.

Harnishfeger, 943 F.3d at 1114.  Importantly, the employee must

not have taken "deliberate steps" to link himself and his speech to

"the employer's mission, purpose, or image."  Id. (additional

quotation omitted).  If the employee did so, then the speech will not

be protected, and the Pickering balance will not apply.

While Plaintiff's speech was outside the workplace and was

addressed to a large public audience, albeit an online audience,

Plaintiff also took deliberate steps to link himself and his posts to

his employer.  His Facebook page was set to public viewing, and he

listed the Illinois Department of Corrections as his employer,

Corrections Sergeant as his title, and included a photo of him in his

uniform on the page.  His profile did not include any disclaimer that

it was his personal account or that the views posted there were his

own and not those of the Department.  The information listed on

Plaintiff's Facebook page and the uniformed photo tied his page and

the views stated there to the Department's image.  See generally

Roe, 543 U.S. at 84 (police officer's off-duty conduct in which he

wore his uniform "linked [his expression] to his official status as a

police officer.")  Indeed, that the author of the Chicago Sun Times
article could easily identify Plaintiff as a Department employee
makes clear that he linked his profile and his posts to his work.
Def.'s Ex. 3.  Because Plaintiff linked, both by word and image, his
speech as expressed in the Facebook posts to his status as a
Correctional Sergeant with the Illinois Department of Corrections,
his claim cannot pass the second alternative threshold inquiry
under NTEU.

Even if Plaintiff's claim could pass either of the alternative
threshold inquiries of Connick-Garcetti or NTEU, the balancing test
set out in Pickering weighs against his claim.  In Pickering, the
Supreme Court held that a public employee's speech is subject to a
"balanc[ing] between the interests of the [employee], as a citizen, in
commenting upon matters of public concern and the interest in the
State, as an employer, in promoting the efficiency of the public
services it performs through its employees." Id. at 568.  Several
factors are considered in this balancing, none of which is dispositive
alone, including:

> (1) whether the speech would create problems
> in maintaining discipline or harmony among
> co-workers; (2) whether the employment

> relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

Harnishfeger, 943 F.3d at 1115.  The public employer bears the burden of persuasion by a preponderance of the evidence that the balance weighs in favor of allowing the employer's conduct.  Id. at 1115–16.  The employer must come forth with actual evidence of what its concerns "really were" when it acted.  Id. at 1116.

On the evidence in the record, the Pickering balancing here favors the Department.  Investigator Creek's report makes clear that the Department was concerned about the negative public exposure to which the Department was subjected as a result of Plaintiff's posts.  Def.'s Ex. 12.  Creek's report relied heavily on the Chicago Sun Times article which included a screenshot of Plaintiff's post about a possible civil war or government overthrow as well as references to his posts about his beliefs on religion and human sexuality.  Def.'s Ex. 3.  The report concluded by stating that the

posts reflected negatively on the Department and its overall mission.  Id.

Plaintiff's posts also clearly impact the Department's employee harmony and necessity of some form of loyalty to the Department. As the Department points out, Plaintiff was responsible for supervising other correctional officers at Robinson Correctional Center and his posts regarding religion and human sexuality would deter, at bottom, those under his supervision from approaching him and performing their jobs to the best of their ability for fear of discrimination by Plaintiff.

Moreover, Plaintiff's role as a Correctional Sergeant in the Illinois prison system necessitates at least some form of loyalty to the Department.  Plaintiff's statement that he, as a government employee, would like to participate in a government overthrow or civil war plainly undermines the loyalty the Department is entitled to expect of employees.  Defendant's interest in maintaining the function of the Department plainly outweighed Plaintiff's interest in expressing his wish to participate in a government overthrow or civil war.  On the facts of this case, the Pickering balancing favors the

Department.  Therefore, Defendants are entitled to summary judgment on the merits of Count I.

Defendants also raise the affirmative defense of qualified immunity to Plaintiff's request for damages suffered as a result of the alleged First Amendment violation.  Generally, government officials performing discretionary functions may raise qualified immunity as a shield when faced with a suit for damages under 42 U.S.C. § 1983.  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity "protects all but the plainly incompetent and those who knowingly violate the law."  Kemp v. Liebel, 877 F.3d 346, 350 (7th Cir. 2017).  Government officials are entitled to qualified immunity unless the plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  Id.

Defendants here are entitled to qualified immunity.  "It is 'an undeniable fact'" that balancing tests like Pickering's "'produce a wide gray area between the clearly legal and clearly illegal, and the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that

gray area.'" <u>Harnishfeger</u>, 943 F.3d at 1120 (quoting <u>Gustafson v.</u> <u>Jones</u>, 117 F.3d 1015, 1021 (7th Cir. 1997)).  Defendants' actions in suspending Plaintiff for speech that threatened to disrupt the Department's ability to render efficient and effective public service certainly fell at least within the gray area <u>Pickering</u>'s balancing test creates.  Under clearly established law as stated in <u>Pickering</u>, Defendants satisfied their burden by producing evidence that Plaintiff's speech would have undermined the Department's ability to effectively serve the public.  Therefore, Defendants here are entitled to the protections of qualified immunity as to the damages requested in Count I.

**b.**     **The Department's Code of Conduct was not impermissibly vague under the Fourteenth Amendment because the Code of Conduct sufficiently defined a range of acceptable conduct from which Plaintiff's conduct deviated.**

Plaintiff also brings an as-applied challenge to the Department's Code of Conduct under the Fourteenth Amendment. Defendants raise, and are entitled to, the qualified immunity defense as to this claim because the Department's Code of Conduct did not violate clearly established law.

Generally, laws or regulations promulgated by the government
and applicable to the public at large violate the Due Process Clause
of the Fourteenth Amendment "if people of common intelligence
must necessarily guess at [the law's] meaning and differ as to its
application." Greer v. Amesqua, 212 F.3d 358, 369 (7th Cir. 2000)
(citing Grayned v. City of Rockford, 108 U.S. 108–09 (1972).
However, regulations or policies promulgated by the government as
a function of the government's role as an employer are held to a
lower standard. Id. (quoting Keen v. Penson, 970 F.2d 252, 259
(7th Cir.1992) ("The Department need not have adopted 'a quasi-
criminal code' in establishing employment regulations.") Instead,
such employment policies will only violate the Due Process Clause if
they do not "sufficiently define a range of inappropriate conduct
which a reasonable employee would understand" or "convey
adequate warning" that particular conduct will result in discipline.
Greer, 212 F.3d at 369.

Under Seventh Circuit precedent in Greer, Defendant's actions
here did not violate clearly established law. In Greer, the Seventh
Circuit rejected a government employee's void-for-vagueness
argument as it related to the City of Madison, Wisconsin's Fire

Department policies.  Those policies required employees to "conduct themselves so as not to bring the Department into disrepute; treat their superiors with respect [and] conform to the rules and regulations of the Department; conform to and promptly and cheerfully obey all laws, ordinances, rules, regulations, and orders; not [to] harass co-employees because of their sexual orientation; and not to engage in harassment on the basis of race, sex, religion, color, age, disability, national origin or sexual orientation."  Id. (internal quotation and additional citation omitted).

The Code of Conduct here as applied to Plaintiff is substantially similar to the policies in Greer.  Like the Greer policies, AD 03.02.108, ID 03.02.108, and Department Rule 120 each directed Department employees, including Plaintiff, "to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department."  Defs.' Ex. 7 p. 1; see also Defs.' Ex. 8 pp. 1 & Def.'s Ex. 9.  A subsection of ID 03.02.108 provided Department employees further direction, just as the Greer policies did, prohibiting Department employees from discriminating against

other employees or offenders on the basis of "race, color, sex, religion, age, arrest record, national ancestry, or origin, physical or mental disability, marital status, sexual orientation, citizenship status, or unfavorable discharge from the military services."  Def.'s Ex. 8 p. 15.  And while the Code of Conduct here is written "in general language" applicable to a variety of scenarios, AD 03.02.108, ID 03.02.108, and Department Rule 120 sufficiently define a range of standard conduct by which an employee would be measured.  Greer, 212 F.3d at 369.  Defendant's actions in suspending Plaintiff for deviating from that range of appropriate conduct when Plaintiff made statements that reflected poorly on the Department was not in violation of the Due Process Clause or clearly established law under Greer.  Accordingly, Defendants are entitled to qualified immunity on Count II and summary judgment on the merits as to the injunctive relief requested.

## IV.   CONCLUSION

Defendants' actions in suspending Plaintiff following an investigation into remarks Plaintiff made while identifying himself to the public as an employee of the Illinois Department of Corrections did not violate Plaintiff's rights under the First Amendment.  The

Department's Code of Conduct also does not violate the Fourteenth

Amendment's requirements against vagueness.  The Court reaches

these conclusions without considering the material contained in

Exhibit 20 to Defendant's Motion for Summary Judgment.

Accordingly, Plaintiff's Motion for Partial Summary Judgment (d/e

33) is denied, Defendant's Motion for Summary Judgment (d/e 35)

is granted, and Plaintiff's Motion to Strike Exhibit 20 (d/e 37) is

denied.  The Clerk is directed to enter judgment in favor of

Defendants on all Counts.

**IT IS SO ORDERED.**
**ENTERED: December 8, 2022.**
**FOR THE COURT**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**